**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **LOUISE DAVIS**, *et al.*, | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 15-1194 (JEB)** |
| **DISTRICT OF COLUMBIA,** | |
| **Defendant.** | |

**MEMORANDUM OPINION**

Almost every American child goes through the ordeal of starting at a new school at least

once in her lifetime.  Yet the fact that the experience is common does not make it less nerve-

racking or daunting — for parent and student alike.  In this case, Plaintiff Louise Davis sent her

daughter N.D., a student who had since preschool benefited from special-education

interventions, to a public charter school located here in Washington at the beginning of the fourth

grade.  After a few months, that new school reduced N.D.'s services.  By the end of the academic

year, it found that she was no longer disabled.  And following that decision, the school refused to

test her for additional categories of disabilities.  Having lost her administrative challenge to those

determinations, Davis has now, pursuant to the Individuals with Disabilities Education Act,

brought this action against Defendant District of Columbia.

As is customary in IDEA cases, the Court reviews the administrative ruling following

summary-judgment cross-motions.  Because that decision was fatally imprecise as to whether

N.D. had a particular disability and erred in concluding that she did not require additional

assessments, the Court will grant a segment of Plaintiff's Motion.  In doing so, it remands to the

hearing officer on that disability issue and orders that Defendant provide further testing.

1

**I.       Background**

This case concerns the education of N.D., a child born in 2004, and her transition to KIPP

DC: WILL Academy Public Charter School during the 2013-2014 academic year.  Before the

Court delves any farther into the administrative record (for short, A.R.), see ECF Nos. 9-10, it

assembles the statutory armature on which this narrative rests.

     A.   IDEA Statutory Framework

The Individuals with Disabilities Education Act has, since 1975, been a pillar of the

special-education landscape.  The Act attempts "to ensure that all children with disabilities have

available to them a free appropriate public education" and "that the rights of children with

disabilities and parents of such children are protected."  20 U.S.C. § 1400(d)(1).

To advance these goals, IDEA requires state and local educational agencies that seek

federal funding to first adopt procedures for securing appropriate services for students with

disabilities.  Id. §§ 1412, 1413.  Here, the school district — D.C. Public Schools — is the

District's sole local educational agency, though DCPS and KIPP have collaborated on various

special-education choices.  See 5-E D.C. Mun. Regs. §§ 923.3(a), 924.3; B.R. ex rel. Rempson v.

District of Columbia, 802 F. Supp. 2d 153, 160-61 (D.D.C. 2011) (describing how public charter

schools may elect to be D.C. public schools for IDEA purposes).

The Act's process begins with identifying a child who may have a disability and then

evaluating that impairment.  See 20 U.S.C. § 1401(3)(A) (defining "child with a disability"); id.

§ 1414 (outlining procedures for evaluations and eligibility determinations); 34 C.F.R.

§§ 300.301-.311 (similar).  If she indeed exhibits a disability in need of remediation, then she is

eligible for special-education services.  As not all disabilities are permanent or even manifest, the

school district generally must reevaluate a child's status at least once every three years and at

most annually.  See 20 U.S.C. § 1414(a)(2)(B).

Once found eligible, children with disabilities are entitled to an individualized

educational program.  The IEP — a document that teachers reference in classroom instruction —

"sets out the child's present educational performance, establishes annual and short-term

objectives for improvements in that performance, and describes the specially designed

instruction and services that will enable the child to meet those objectives."  Honig v. Doe, 484

U.S. 305, 311 (1988); see 20 U.S.C. § 1414(d)(1)(A).  To draft it, the school district convenes a

group — typically prior to the academic year — consisting of the parents, a special-education

teacher, a school-district representative, and possibly other specialists.  See 20 U.S.C.

§ 1414(d)(1)(B).  Although the district may subsequently modify that IEP at any time if it

notifies the parents and explains the changes in writing, id. § 1415(b)(3), (c)(1), it must revise the

Program at least yearly in light of academic progress, changes in needs, and other recent

educational or medical information.  Id. § 1414(d)(4)(A).

Aside from its process-based guarantees, IDEA sets a "basic floor of opportunity" for

what substantively counts as an appropriate education.  Bd. of Educ. of Hendrick Hudson Cent.

Sch. Dist. v. Rowley, 458 U.S. 176, 200 (1982).  To pass muster, the school district must, at a

minimum, "provid[e] personalized instruction with sufficient support services to permit the child

to benefit educationally from that instruction."  Id. at 203; accord Reid ex rel. Reid v. District of

Columbia, 401 F.3d 516, 519 (D.C. Cir. 2005).

Parents who object to the district's "identification, evaluation or educational placement"

of their child or to its "provision of a free appropriate public education" may request a due-

process hearing.  See 20 U.S.C. § 1415(b)(6).  At that hearing, headed by an impartial hearing

officer, the parties may present evidence and elicit expert testimony about the child's educational needs.  Id. § 1415(f), (h).  A party aggrieved by the hearing officer's decision (HOD) may then sue in state or federal court.  Id. § 1415(i)(2).  In reviewing the HOD, a court has broad remedial authority to grant "such relief as the court determines is appropriate."  Id. § 1415(i)(2)(C)(iii); see Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter, 510 U.S. 7, 16 (1993).

Having set out the statutory framework, the Court next details the expansive factual background of this case and concludes with the procedural path of Plaintiff's challenge.

B.  N.D.'s Educational History

The present season of N.D.'s education involves, in one way or another, each step of this process.  The Court recaps her early academic history and then describes her experience transitioning to KIPP in the fourth grade — that is, her 2013 IEP, Revised 2013 IEP, and subsequent removal from special education altogether, and the events that followed.

1.  *Early Education*

N.D. has been raised by her mother in Southeast Washington since her birth in 2004.  See A.R. (December 2010 Psychiatric Report) at 30, 34.  In far from a normal delivery, Davis gave birth to N.D. two months early after falling down a set of stairs.  Id. at 32.  In addition to several medical issues that ensued, the child missed developmental milestones, only beginning to walk at around the age of two and talk at three or four.  Id.

N.D. attended Eagle Academy Public Charter School from prekindergarten (at three years old) until the third grade.  See A.R. (May 2014 Psychological Report) at 158.  There, her school implemented IEPs and special-education services to compensate for her diagnosed learning difficulties, developmental delays, and Attention Deficit Hyperactivity Disorder.  See 2010 Psych. Report at 34.  In her early years at Eagle Academy, specialists would pull N.D. out of the

general-education classroom setting for 10 hours per week of specialized instruction and for other therapy.  See 2014 Psych. Report at 158.  Even with these interventions, she was held back and repeated the first grade.  See A.R. (May 2011 Educational Report) at 47.

In December 2010, during her second stint in first grade, the school referred her for psychiatric testing.  Following clinical interviews, she was again diagnosed with ADHD, as well as with acute Post-Traumatic Stress Disorder and an unspecified anxiety disorder arising out of a public-bus accident after which she and other passengers were hospitalized.  See 2010 Psych. Report at 30-31, 36.  Her psychiatrist also expressed concern over developmental delays and advised Eagle Academy to investigate whether N.D. "does in fact have a Learning Disability" so that Davis could "ensur[e] that the current level of services she receives via her IEP is adequate and appropriate" and "advocat[e] for more intensive services" if needed.  Id. at 37.

Later testing confirmed these suspicions.  At the end of first grade, in May 2011, school assessments verified that N.D. displayed serious academic deficits — e.g., "significant weakness in broad written language" and "vocabulary and language deficits" — that required "special education remediation . . . as a learning disabled student" and "speech and language services." 2011 Educ. Report at 49; A.R. (May 2011 Speech-Language-Impairment Report) at 56-57.  The record does not reflect whether N.D.'s subsequent second-grade 2011 IEP formally identified her as learning disabled.  A later IEP indicates that it likely did, however, as throughout the second grade she received an increased 15 hours per week of specialized instruction outside the general-education classroom.  See A.R. (2012 IEP) at 59, 70.

As to N.D.'s third-grade history, the 2012 IEP lists her primary disability as a "Specific Learning Disability."  Id. at 59.  IDEA defines that impairment as follows:

> The term "specific learning disability" means a disorder in 1 or more of the basic psychological processes involved in understanding or in

> using language, spoken or written, which disorder may manifest
> itself in the imperfect ability to listen, think, speak, read, write, spell,
> or do mathematical calculations.

20 U.S.C. § 1401(30)(A).  Federal rules then sketch out what may qualify, and D.C. regulations

shade in the details.  See 34 C.F.R. §§ 300.307, .309(a); 5-E D.C. Mun. Regs. §§ 3000, 3006.4.

(Of course, this diagnosis did not necessarily mean that a Specific Learning Disability was N.D.

only disorder, as services are available for a wide array of disabilities.)  Although relevant, the

Court will not turn its microscope to these minutiae yet.

Suffice it to say that, on account of her disorder, Eagle Academy continued to pull her out

of the classroom for services.  In particular, her 2012 IEP mandated 10 hours per week of

specialized instruction, 30 minutes per week of speech therapy, and another 30 minutes per week

of behavioral support.  See 2012 IEP at 64-65.  It additionally provided testing accommodations

— e.g., extended time, frequent breaks — and other instructional supports.  Id. at 66, 68.

## 2. *2013 IEP (Fourth Grade)*

The present dispute arises out of the IEP prepared in May 2013 in anticipation of N.D.'s

entry into fourth grade.  See A.R. (2013 IEP) at 78.  Few new developments had occurred in the

course of the third grade: She continued psychiatric treatment, where her therapist confirmed her

ADHD, PTSD, and learning disability.  See A.R. (2012 Treatment Plan) at 73.

Unsurprisingly then, not much about the 2013 IEP differed either.  That IEP, drafted by

Eagle Academy, listed N.D. as having a Specific Learning Disability.  See 2013 IEP at 78.  It

continued to require, weekly, 10 hours of specialized instruction, 30 minutes of speech therapy,

and 30 minutes of behavioral-support services, as well as testing accommodations.  Id. at 84, 86.

The only notable alteration was that, instead of being pulled out of the classroom for these

interventions, the 2013 IEP kept her in the classroom for push-in services.  Id. at 84.

Having spent her entire academic life in the same school and with a relatively constant educational program, that summer N.D. braved the transition from Eagle Academy to KIPP.

3.  *Revised 2013 IEP (Fourth Grade)*

An IEP adjustment then occurred in November 2013, a few months after the start of the KIPP school year.  At that time, KIPP convened a meeting to modify the (May) 2013 IEP.  See A.R. (November 2013 Revised IEP) at 96.  Although a few pages of the final Revised 2013 IEP are missing, later documentation shows that it reduced N.D.'s special-education hours.  Notably, it required only 7.5 hours per week of specialized instruction (down from 10 hours), 120 minutes per month of speech therapy (minimally reduced from 30 minutes per week), and 20 minutes per month of behavioral support (down from 30 minutes per week).  See A.R. (March 2014 IEP Amendments) at 141 (minor amendment incorporating Revised 2013 IEP); A.R. (HOD) at 7-8.

Contemporaneous standardized testing shows that, at that time, N.D.'s scores for mathematics and reading fell within the 39th and 48th percentile, respectively, slightly exceeding the district-wide average.  See A.R. (NWEA Assessments) at 272.  And, although grading is a fickle beast, her first-quarter grades stood at B+, B, and A- in her main courses (general knowledge, literacy, math), enough to make the honor roll.  See A.R. (2013 Report Card) at 107. At the same time, her still-incomplete second-quarter grades stood at A-, B, and C+ in those same subjects.  See A.R. (November 2013 Grades) at 104.  (Eventually, she would receive a B+ in each course.  See 2013 Report Card at 106.)

Following her Revised 2013 IEP, N.D. maintained honor-roll status throughout the third quarter, and her standardized test scores appeared to improve.  See NWEA Assessments at 272; 2013 Report Card at 105.

4.  *May 2014 Exit from Special Education*

The fourth grade, however, would prove to be a watershed school year for other reasons. As it had been three years since N.D.'s disability was last mulled, she was due for a reevaluation. <u>See</u> 20 U.S.C. § 1414(a)(2)(B) (requiring reevaluation at least once every three years).  Those wheels began turning in April 2014.  It naturally started with KIPP's analysis of how N.D. had fared in the fourth grade under her Revised 2013 IEP.  <u>See</u> A.R. (April 2014 Data Analysis).

From the school's point of view, N.D. had made broad strides — *e.g.*, in expressive and receptive language and in emotional, social, and behavioral development.  <u>Id.</u> at 150-51.  Not unqualifiedly, however.  For instance, the school reported that for math "[t]he growth [N.D.] made from her Fall to Winter [test] score was not adequate growth and did not improve her percentile range."  <u>Id.</u> at 147.  The analysis also suggested that "[N.D.] performs in the Low Average range in Literature and Foundations/Vocabulary and would benefit from additional support in those areas" and "continues to struggle with written directions for curriculum based activities."  <u>Id.</u> at 148, 150.  All in all, though, KIPP's internal analysis skewed optimistic, noting that she had made "expected progress" and "adequate growth" following certain services.  <u>Id.</u> at 148, 150-52 (noting she was "making gains" and "progressing steadily").

DCPS also supplied a new battery of testing.  A school-district psychologist first examined N.D., incorrectly observing that she had "no reported grade retentions."  2014 Psych. Report at 158.  The clinician then found that her "cognitive abilities are in the 'Low Average'" range, <u>id.</u> at 163-64, and at times her achievement was almost two years below age level.  <u>See</u> A.R. (April 2014 Woodcock-Johnson III Scores) at 155.  But because information suggested that "with reasonable general education options, interventions, adaptation and other general education strategies . . . [N.D.] is able to access her general education expectations," the report

recommended "exiting [N.D.] from the Specific Learning Disability (SLD) category." 2014

Psych. Report at 166.  A separate specialist concluded that, though she "would benefit from a

customized set of strategies that should be incorporated in her overall educational plan," she did

not have a speech-language impairment.  See A.R. (May 2014 Speech-Language-Impairment

Report) at 179-80.

     After reviewing this information, KIPP exited N.D. from special education in May 2014,

concluding, in part, that she longer met "the required criteria for specific learning disabilities."

A.R. (May 2014 Eligibility Form) at 186.  Although she satisfied two of three "Discrepancy

Model" prerequisites, KIPP found that she had not met its final criterion — namely, that

> [t]he student demonstrates a discrepancy between achievement (as
> measured by the academic evaluation) and measured ability (as
> measured by the intellectual evaluation) of two years below a child's
> chronological age and/or at least two standard deviations below the
> child's cognitive ability as measured by appropriate standardized
> diagnostic instruments and procedures.

Id. at 187.  In other words, because N.D. did not experience a gap between achievement and

cognition of two years or standard deviations, KIPP would no longer guarantee special-education

interventions or other accommodations starting in the upcoming academic year.

     5.  *Continued Discussions in Fifth Grade*

     Discussions about N.D.'s education continued during the fifth grade.  At Davis's request,

by November 2014, KIPP had agreed to fund two third-party, independent educational

evaluations (IEEs): a psychological review and a speech-language assessment.  See A.R. at 216;

see also 34 C.F.R. § 300.502(b)(1) (providing right to IEE if parent disagrees with school's

evaluation).  When the psychological testing finished, the school invited Davis to meet and

review its findings.  See A.R. at 235.

That meeting did not result in much.  While the third-party psychologist had seen N.D., a written report had not yet been drafted.  Davis, KIPP, and DCPS instead engaged in a protracted back-and-forth over recent grades and standardized-test scores.  Although N.D. had received an A, B-, and A (general knowledge, literacy, and math) in the final quarter of fourth grade, those grades had fallen to B, C+, and B+ (science and social studies, reading, and math) for the first quarter of fifth grade.  See A.R. (December 2014 Grade Report) at 260-61.  The second quarter was still incomplete, but her marks had further declined to a C, C, and B, with an additional F for a technology course and D+ in a supplemental literacy intervention.  Id. at 261; see A.R. (2014 Literacy-Intervention Report) at 280.  On the other hand, a child's trajectory is rarely linear, and the record shows that N.D. had made strides on standardized metrics, surpassing the 50th percentile for the first time in both math and reading testing.  See NWEA Assessments at 272.

From this data, N.D.'s teacher observed that "[s]he is making slow but steady progress." A.R. (December 2014 Meeting Notes) at 253.  A DCPS speech-language expert also remarked that the gap between N.D.'s cognition and achievement was still within 1.5 standard deviations of average.  Id. at 258.  The District summed up its position: "Yes, she is below [grade level], but she is showing significant growth."  Id.  Without any of the independent reporting, however, the parties broke off the meeting to await further results.  Id. at 259.

The speech-language IEE came back first.  Based on its own testing, it concluded that N.D. experienced basic language-knowledge problems (that is, trouble understanding vocabulary and word meaning), grammatical issues, and other difficulties.  See A.R. (December 2014 Speech-Language-Impairment IEE) at 276.  The specialist, suspecting that other issues were at play as well, then recommended testing for a separate auditory-processing deficit.  Id.

The psychological IEE next determined that N.D. "would benefit from school based support and accommodations to address her learning issues and attention deficits." A.R. (December 2014 Psychological IEE) at 335.  In part because her achievement lagged behind her intellectual ability significantly (sometimes by over two years), the psychologist diagnosed her with Specific Learning Disabilities in reading, written expression, and mathematics. Id.  The report thus recommended that KIPP should offer N.D. special-education services and, on account of her poor visual-motor integration, also conduct occupational-therapy testing. Id. at 335-36.

C.  Due-Process Challenge

KIPP and DCPS did not respond to these reports immediately.  Instead, in February 2015, Davis filed an administrative complaint on behalf of her daughter with the District.  See A.R. (Administrative Complaint) at 341.  In it, she contended that KIPP and DCPS had deprived N.D. of a free appropriate public education by developing a lackluster Revised 2013 IEP, inappropriately exiting her from special education, and failing to comprehensively evaluate her by neglecting to provide auditory-processing and occupational-therapy assessments after the two IEEs flagged new potential areas of disability. Id. at 346-47.

DCPS then prepared written reviews of both third-party evaluations.  After further observations, the school-district psychologist concluded that N.D. did not, in fact, qualify for a Specific Learning Disability.  See A.R. (February 2015 Review of Psychological IEE) at 392-93. DCPS's speech-language review similarly concluded that N.D. did not have "a disabling communication disorder that would prevent her from accessing or gaining benefit from the general education curriculum." A.R. (February 2015 Review of SLI IEE) at 374.

In March 2015, KIPP again met to discuss whether N.D. should receive services for the following year — that would be the sixth grade.  By March, her second-quarter grades had fallen

to a C+, C, and B (science and social studies, reading, math) and her third-quarter marks had

dipped across the board to a C, D, and C+.  <u>See</u> A.R. (March 2015 Meeting Notes) at 443.  The

DCPS psychologist sought to distinguish the IEE on the basis that it still did not establish a two-

standard-deviation cognition–achievement gap.  <u>Id.</u> at 448-49.  After a lengthy discussion, KIPP

again found that N.D. had no disabilities.  <u>See</u> A.R. (March 2015 Eligibility Form) at 464.

As talks stalled, Davis's administrative proceedings continued.  Over two days in April

2015, a hearing officer heard testimony from her, various third-party and DCPS specialists, and a

KIPP compliance manager privy to the past two years' meetings.  <u>See</u> A.R. (Hearing Transcript)

at 654, 971.  In the resulting decision, the hearing officer sided with KIPP and DCPS in all

respects.  Specifically, the HOD held that the Revised 2013 IEP's modifications were

appropriate, that KIPP properly exited N.D. from special education at the end of fourth grade (as

she was not disabled), and that in fifth grade the school comprehensively evaluated her following

the IEEs.  <u>See</u> HOD at 12-25.

In July 2015, Davis, acting on behalf of N.D., brought this action against the District to

challenge the HOD.  <u>See</u> ECF No. 1 (Complaint).  In her Complaint, Plaintiff asks the Court to

conclude that Defendant denied N.D. a free appropriate public education, reinstate her special-

education services, order occupational-therapy and auditory-processing testing, and award some

amount of compensatory education.  <u>Id.</u> at 10.

The parties' Cross-Motions for Summary Judgment, seeking the Court's review of the

administrative decision, are now ripe.

## II.   Legal Standard

The Court's approach toward IDEA administrative decisions diverges somewhat from its

role in the typical lawsuit.  Although the Motions bear the familiar placard of "summary

12

judgment," judicial review of hearing-officer decisions does not follow "a true summary judgment procedure." L.R.L. ex rel. Lomax v. District of Columbia, 896 F. Supp. 2d 69, 73 (D.D.C. 2012) (quoting Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1472 (9th Cir. 1993)).

Congress has instead charged courts to make "independent decision[s] based on a preponderance of the evidence." Rowley, 458 U.S. at 205 (quoting S. Rep. No. 94-455, at 50 (1975)). The Act directs a reviewing court to examine the underlying record, hear additional evidence presented by the parties, and then decide the appropriate relief, basing its decision on a preponderance of the evidence, see 20 U.S.C. § 1415(i)(2)(C) — directives that implicate a tribunal's "powers of fact-finding." Reid, 401 F.3d at 522. A motion for summary judgment therefore "operates as a motion for judgment based on the evidence comprising the record." James v. District of Columbia, 194 F. Supp. 3d 131, 139 (D.D.C. 2016).

In this process, "a party challenging the administrative determination . . . take[s] on the burden of persuading the court that the hearing officer was wrong." Kerkam v. McKenzie, 862 F.2d 884, 886 (D.C. Cir. 1988). This allocation coincides with the standard at the due-process-hearing level, where "the burden of proof [is] the responsibility of the party seeking relief." 5-E D.C. Mun. Regs. § 3030.14; 53 D.C. Reg. 5,259 (June 30, 2006) (amending standard placing burden on District); see Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 61 (2005) (declining to decide if states may "override [burden-of-proof] default rule[s]").

Yet a court's fact-finding project is neither boundless nor plenary. "[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206. Courts must instead give "due weight" to the administrative officers. Id.; see Kerkam, 862 F.2d at 887 ("Deference to the

hearing officer makes sense in a proceeding under the Act for the same reasons that it makes sense in the review of any other agency action — agency expertise, the decision of the political branches (here state and federal) to vest the decision initially in the agency, and the costs imposed on all parties of having still another person redecide the matter from scratch.").

Although the Circuit has not precisely "capture[d] the appropriate deference in some formula," Kerkam, 862 F.2d at 887, it is at least clear that an "IDEA hearing officer's decision warrants 'less deference than is conventional in administrative proceedings.'" District of Columbia v. Doe, 611 F.3d 888, 897 (D.C. Cir. 2010) (quoting Kerkam, 862 F.2d at 887).  That deference is at its apex when the court is reviewing matters of "educational policy," Rowley, 458 U.S. at 206, or choices implicating "agency expertise," Kerkam, 862 F.2d at 887, and at its nadir when the decision lacks thorough, reasoned findings or opines on a purely legal question.  Reid, 401 F.3d at 521 (reviewing de novo "a pure question of law"); see Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, No. 15-827, 2017 WL 1066260, at *12 (U.S. Mar. 22, 2017) ("A reviewing court may fairly expect those authorities to be able to offer a cogent and responsive explanation for their decisions."); B.D. v. District of Columbia, 817 F.3d 792, 797 (D.C. Cir. 2016) ("[W]e give 'little deference' to 'a hearing decision without reasoned and specific findings.'") (quoting Reid, 401 F.3d at 521).

III.    **Analysis**

Davis's action centers on N.D.'s fourth-grade transition to KIPP.  As she argued before the hearing officer, Plaintiff now asserts that the District denied her daughter a free appropriate public education when it reduced N.D.'s services in the Revised 2013 IEP, found her ineligible for special education later in that grade, and failed to follow independent recommendations that testing in other areas of disability be done.  The Court looks at each matter separately.

A. <u>Revised 2013 IEP</u>

Plaintiff first challenges the Revised 2013 IEP's appropriateness.  She contends that KIPP reduced N.D.'s services too drastically, mere months into the fourth grade, and without any supporting data.  To repeat, the principal changes in the Revised 2013 IEP were that N.D. would receive 7.5 (instead of 10) hours per week of specialized instruction and 20 minutes per month (instead of 30 minutes per week) of behavioral support.  <u>See</u> Revised 2013 IEP at 141.  Davis adds that the Revised 2013 IEP did not contain adequate speech-language goals.  The hearing officer disagreed, finding each of these facets of the Program to be appropriate.

The Court first explains the standard for judging whether an IEP offers an appropriate education before analyzing the November 2013 revisions in specialized instruction, behavioral support, and speech-language goals.

1. *Appropriate Education*

As synopsized above, for a school to deliver an appropriate education under IDEA, a student's IEP must "provid[e] personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." <u>Rowley</u>, 458 U.S. at 203.  "To meet [this] substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." <u>Endrew F.</u>, 2017 WL 1066260, at *10.  "[I]f the child is being educated in the regular classrooms of the public education system, [the IEP] should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." <u>Rowley</u>, 458 U.S. at 204.  "Progress through this system is what our society generally means by an 'education.'  And access to an 'education' is what the IDEA promises." <u>Endrew F.</u>, 2017 WL 1066260, at *10.  It follows then that an

"educational program must be appropriately ambitious in light of [the child's] circumstances," as "every child should have the chance to meet challenging objectives." Id. at *11.

Congress nevertheless did not intend to guarantee a "potential-maximizing education." Rowley, 458 U.S. at 197 n.21. The relevant inquiry is not whether added services are "more appropriate or better able to serve the child." Jenkins v. Squillacote, 935 F.2d 303, 305 (D.C. Cir. 1991); see Endrew F., 2017 WL 1066260, at *10 ("[T]he question is whether the IEP is reasonable, not whether the court regards it as ideal."). Instead, as "'the benefits obtainable by children at one end of the [disability] spectrum will differ dramatically from those obtainable by children at the other end, with infinite variations in between,'" what constitutes a substantively adequate education "will always require a fact-intensive and child-specific inquiry." Branham v. District of Columbia, 427 F.3d 7, 12 (D.C. Cir. 2005) (quoting Rowley, 458 U.S. at 202). This "fact-intensive inquiry" involves "a prospective judgment by school officials" as to how "'specially designed'" services will ultimately "meet a child's 'unique needs.'" Endrew F., 2017 WL 1066260, at *10 (quoting 20 U.S.C. § 1401(29)). Although "the IDEA cannot and does not promise [that] 'any particular [educational] outcome'" will follow, a student's "progress [can] plainly demonstrate[] that her IEP was designed to deliver more than adequate educational benefits." Id. at *9.

## 2. *Specialized Instruction*

Regarding the first of three modifications in the Revised 2013 IEP, Plaintiff challenges that the reduction from 10 hours or more per week on past IEPs to 7.5 hours was unreasonable. The hearing officer concluded, after noting there was "little evidence" and examining only N.D.'s fall 2013 grades and standardized-test scores, that this change was appropriate. See HOD

at 13.  In doing so, he dismissed Davis's argument that the school should have collected more data on N.D.'s progress and performance before making its cuts.

The Court does not affirm the HOD summarily.  This is especially so because the hearing officer grappled with neither the original 2013 IEP's goals (which spelled out areas of progress that needed monitoring) nor N.D.'s educational history (which involved her receiving 10 hours per week as a minimum for at least five years).  See 20 U.S.C. § 1414(d)(4)(A)(i) (requiring team to "determine whether the annual goals for the child are being achieved"); A.R. (2013 IEP Progress Report) at 111-19 (leaving all but one goal blank for fall 2013 reporting period); see also 2013 IEP; 2012 IEP: 2014 Psych. Report at 158.  Instead, the Court makes its own independent determination and looks at the record afresh.  See Rowley, 458 U.S. at 205.

Although Plaintiff contends that a 10-hour minimum had been working "since [N.D.] was three years old," Mot. at 26, her educational trajectory shows that a 2.5-hour reduction from that mark — i.e., 30 minutes less per day — was also reasonable.  Where in N.D.'s 2011 IEP she received 15 hours of specialized instruction, her 2012 IEP cut those services to 10 hours "based upon her academic growth."  2012 IEP at 65, 70.  By the 2013 IEP, she no longer was removed from her classroom to receive those hours, but rather received push-in instruction.  See 2013 IEP at 84-85.  This yearly gradual diminishment of services serves as a promising trend.

The record does not suggest, moreover, that KIPP had no information on which to then make what Davis calls a "dramatic reduction" in hours.  See Mot. at 25.  Fairly read, N.D's test scores and grades were also a mixed bag of results — above district but below national performance, improvement in general knowledge but decline in math.  See NWEA Assessments at 272; November 2013 Grades at 104.  Such results do not suggest that lessening her hours further at the beginning of the fourth grade risked jeopardizing her education.

While a 10-hour weekly target might have been "<u>more</u> appropriate or better able to serve the child," <u>Jenkins</u>, 935 F.2d at 305, Plaintiff has not met her burden to show that 7.5 hours of specialized instruction was inappropriate.  Not only had N.D.'s hours already been diminishing, but her performance was also sparking no concerns.  School districts indeed should be encouraged to "review[] the child's IEP periodically" and "revise[] the IEP as appropriate."  20 U.S.C. § 1414(d)(4)(A); <u>see</u> <u>Harris v. District of Columbia</u>, 561 F. Supp. 2d 63, 68 (D.D.C. 2008) (observing that "IDEA is replete with provisions emphasizing the necessity of monitoring the IEP for revision purposes").

KIPP did, in November 2013, exactly what the Act encouraged it to do — tweak the 2013 IEP based on positive outcomes to see if N.D. could sustain her trajectory.  Perhaps she would; perhaps she would not, in which case they could (and should) again make adjustments.  <u>Endrew F.</u>, 2017 WL 1066260, at *11 (noting need for "appropriately ambitious" IEP aimed at providing "challenging objectives").  Critically, this dynamic is why questions of whether "'ten hours'" or "'[e]ight hours'" or "'[s]even hours'" are appropriate are often "matter[s] of educational policy" best left for school professionals to continually assess, debate, and calibrate.  <u>See</u> Dennis Fan, Note, *No IDEA What the Future Holds: The Retrospective Evidence Dilemma*, 114 Colum. L. Rev. 1503, 1547 (2014) (quoting <u>Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J</u>, 502 F.3d 811, 828 (9th Cir. 2007) (Ferguson, J., dissenting)).

3.  *Behavioral Support*

Davis next takes issue with KIPP's behavioral-support reduction — which targeted N.D.'s ADHD needs — from 30 minutes a <u>week</u> to 20 minutes a <u>month</u>.  <u>See</u> Mot. at 28-29.  As the DCPS psychologist testified, the latter amount "is the minimum level that's possible" and basically entails a specialist's "consulting with the teacher" each month about in-classroom

"direct support" that the student can be given.  See A.R. (Testimony of Dr. Ronita Wooten) at 893-94; see also Mot. at 28 (noting District "completely eliminated direct behavioral support").

The HOD's reasoning again serves as no beacon.  Its only evidentiary support was that the psychologist had relayed that N.D. "had not needed the services for quite some time" before November 2013.  See HOD at 15.  But her testimony was actually that, in completing her May 2014 evaluation, "difficulties with [N.D.'s] attention and focus had not been seen for a significant amount of time during that school year," Wooten Tr. at 888, and the psychologist could not have had firsthand knowledge of the November 2013 revisions, as she was not involved at the time.  See Revised 2013 IEP at 96 (participant list).

The record, however, independently buoys the hearing officer's conclusion.  Although behavioral support had been a staple since at least N.D.'s 2012 IEP, see 2013 IEP at 86; 2012 IEP at 64-65, the evidence that is present supports a conclusion that by November 2013 those interventions were no longer necessary.  The original 2013 IEP first notes that it included 30 minutes per week of behavioral support because "[N.D.] has difficulty engaging in group communication skills as it relates to turn taking skills" and "is unable to remain on task for period of 25-30 minutes."  2013 IEP at 83.  These concerns appear to have quickly dissipated at KIPP.  In four classroom observations in the fourth grade, N.D. was "attentive and focused the whole interval, without additional prompting from an adult."  Revised 2013 IEP at 139.  The very last session showed "appropriate behavior 100% of this 30 minute observation," as she "shared her classroom materials with peers when asked, asked for help when needed, and also helped a student in answering the assignment."  Id.  Because N.D. had thus, by November 2013, swiftly overcome her past behavioral deficits, the Revised 2013 IEP recommended only that "[c]onsultation services . . . be provided to help maintain this progress."  Id. at 140.

All Davis cites in response is her own testimony that, in the fifth-grade classroom, she sometimes saw her daughter "stopp[ing], looking around, not focusing."  A.R. (Testimony of Louise Davis) at 790.  Yet this could be attributed to any number of educational factors — a new teacher, a rowdy bunch, or even an off day or two.  This lone observation is not enough to overcome N.D.'s well-documented behavioral progress.

### 4. *Speech-Language Goals*

Third and last, Davis briefly objects that the Revised 2013 IEP did not include appropriate speech-language goals.  <u>See</u> Mot. at 29.  Although N.D.'s therapy <u>hours</u> remained fairly constant, Plaintiff argues that the specific <u>goals</u> were lacking.  <u>See</u> Revised 2013 IEP at 138-39 (prescribing that N.D. "will demonstrate understanding of curriculum based vocabulary by a) defining it[,] b) using the word in a sentence[,] or c) giving an example in 4/5 opportunities"; "will retell a story in correct sequence including beginning, middle and end in 2 out of 3 opportunities"; and "will describe people, place and events, using 2-3 attributes, in 3 out of 4 opportunities, across 3 consecutive sessions").  Unfortunately for Davis, this final position also lacks the requisite evidentiary thrust.  She points only to the later independent speech-language report that suspected N.D. of having a possible auditory-processing deficit and hypothesized that the Revised 2013 IEP "<u>would be</u> totally inappropriate" to address <u>that</u> deficit, if one were to be confirmed.  <u>See</u> 2014 SLI IEE at 276 (emphasis added); A.R. (Testimony of Dr. Jay Lucker) at 762-63.  Fatally for Plaintiff, that assessment nowhere suggests that the Revised 2013 IEP's three goals were not reasonably calculated to address N.D.'s <u>then</u>-diagnosed speech-language impairment, a wholly separate disability.

\* \* \*

All in all, although the Court's analysis differs from that of the hearing officer, it nonetheless concludes that the Revised 2013 IEP was appropriate.

B. 2014 Ineligibility Determination

In the second act, the parties dispute whether KIPP and DCPS appropriately exited N.D. from special education at the end of the fourth grade.

As touched on previously, school districts must reevaluate students' eligibility at least once every three years and not more frequently than once a year (unless parents and district agree to a different timespan). See 20 U.S.C. § 1414(a)(2)(B). In considering eligibility, multidisciplinary teams convene to review specialists' assessments and other data, including parental input, classroom or other local or state assessments, and observations by teachers and specialists. Id. § 1414(c)(1); 34 C.F.R. §§ 300.305(a), 300.306(c) (pointing to "aptitude and achievement tests, parent input, and teacher recommendations, as well as information about the child's physical condition, social or cultural background, and adaptive behavior"). The team must "[u]se a variety of assessment tools and strategies," "[n]ot use any single measure or assessment as the sole criterion," and otherwise "[u]se technically sound instruments." 34 C.F.R. § 300.304(b). To qualify as a "child with a disability," the student must have a listed disorder and, "by reason thereof, need[] special education and related services." 20 U.S.C. § 1401(3)(A); see Hawkins ex rel. D.C. v. District of Columbia, 539 F. Supp. 2d 108, 109 (D.D.C. 2008).

Beginning in April 2014, KIPP analyzed data of N.D.'s fourth-grade performance and collected reports from a DCPS psychologist and speech-language specialist before concluding that she lacked both a Specific Learning Disability and a speech-language impairment. See 2014 Data Analysis; 2014 Psych. Report; 2014 SLI Report; 2014 Eligibility Form. The hearing officer agreed, see HOD 16-22, and Plaintiff now protests both determinations.

1. *Specific Learning Disability*

Davis first challenges the hearing officer's ruling that N.D. did not qualify for a Specific Learning Disability, for which she had been eligible since at least 2012. See 2012 IEP at 59, 70.

The officer wrote that "[i]n the District, DCPS has developed special education eligibility criteria" for a Specific Learning Disability. See HOD at 17. Then, quoting a KIPP form, he stated that "DCPS'[s] definition for SLD . . . requires" as one of three mandatory components a two-year or two-standard-deviation discrepancy between a student's academic achievement and cognitive ability. Id. (emphasis added); see 2014 Eligibility Form at 187 (noting that, as to discrepancy finding, the school "[m]ust [mark] yes in order to meet the requirement" for the disability). N.D. met the other two criteria, but because she could not demonstrate a sufficient disparity, the officer found that she did not have a Specific Learning Disability. Id. at 17-20.

As neither the parties nor the hearing officer explained where DCPS's criteria or definition originated, the Court ordered further briefing. From those papers, it is clear that this record forms an "incomplete basis for review." Options Pub. Charter Sch. v. Howe ex rel. A.H., 512 F. Supp. 2d 55, 57 (D.D.C. 2007). The Court first offers a disquisition on the regulatory scheme before discussing why a remand is warranted.

a. Statutory & Regulatory Background

Since 1975, IDEA has consistently defined a Specific Learning Disability as follows:

> The term "specific learning disability" means a disorder in 1 or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations.

20 U.S.C. § 1401(30)(A); see Education for All Handicapped Children Act of 1975 (EAHCA), Pub. L. No. 94-142, § 5(b)(4)(A). For decades, federal regulations allowed schools to "determine that a child has a specific learning disability if" she met three criteria, including that

she "has a severe discrepancy between achievement and intellectual ability." 34 C.F.R.

§ 300.541 (1981).  Individual states then defined "severe discrepancy."  Michael P. v. Dep't of

Educ., 656 F.3d 1057, 1060 (9th Cir. 2011).  In the District, the term has long meant "[a]

difference of at least two years below a child's chronological age and/or at least two standard

deviations below the child's cognitive ability."  5-E D.C. Mun. Regs. § 3001.1.

By the early 2000s, Congress raised concerns with the approach, including that there was

"no evidence that the IQ–achievement discrepancy formula can be applied in a consistent and

educationally meaningful (*i.e.*, reliable and valid) manner."  S. Rep. 108-185, at 26 (2003).  An

IDEA amendment instructed that states could no longer "require[] [school districts] to take into

consideration whether a child has a severe discrepancy" and must allow those districts "to use a

process that determines if the child responds to scientific, research-based intervention."

Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108-446, § 101

(codified as amended at 20 U.S.C. § 1414(b)(6)).  The latter response-to-intervention approach

instead gauges whether a child is able to progress under a increasingly intensive series of

general-education instructional interventions.  See Wooten Tr. at 902.

As this amendment implicates federal, state, and school-district regulatory choices, the

Court digs its way through each layer.  First, federal regulations now mandate that states adopt

Specific Learning Disability criteria.  See 34 C.F.R. § 300.307(a).  Those rules provide that

states "[m]ust not require the use of a severe discrepancy between intellectual ability and

achievement" and "[m]ust permit the use of a process based on the child's response to scientific,

research-based intervention."  Id. § 300.307(a), (b); see id. § 300.309(a); Nguyen v. District of

Columbia, 681 F. Supp. 2d 49, 52 (D.D.C. 2010).  In other words, "while a State cannot require

the use of a severe discrepancy model, a State may prohibit, or make optional, the use of a severe

discrepancy model." Letter to Zirkel, 47 IDELR 268 (OSEP 2007).

   In the same set of changes, regulations qualified that states and school districts alike

"must . . . [n]ot use any single measure or assessment as the sole criterion for determining

whether a child is a child with a disability."  34 C.F.R. § 300.304(b)(2); see 20 U.S.C.

§ 1414(b)(2)(B); 71 Fed. Reg. 46,540, 46,642 (Aug. 14, 2006).  As interpreted in the Specific

Learning Disability context, these rules require "a holistic inquiry in identifying an SLD."  Doe

v. Cape Elizabeth Sch. Dist., 832 F.3d 69, 80 (1st Cir. 2016); see E.M. ex rel. E.M. v. Pajaro

Valley Unified Sch. Dist. Office of Admin. Hearings, 652 F.3d 999, 1004 (9th Cir. 2011)

(holding that district "must make a reasonable choice" after "considering all relevant material

available on a pupil").  "[M]uch as no single assessment or measure could support a finding of a

[Specific Learning Disability], no single assessment or measure may undermine a finding of [that

disability], where other measures could support such a finding."  Doe, 832 F.3d at 80; see

Greenwich Bd. of Educ. v. G.M., No. 13-235, 2016 WL 3512120, at *12 (D. Conn. June 22,

2016) (finding that reliance on "one evaluative tool," such as the intervention model, would

"prematurely and improperly cut-off the disability review process").

   With regard to the severe-discrepancy model, this means that, "although a school district

may lawfully utilize a severe discrepancy approach to determine whether a child has an SLD, . . .

[a severe-discrepancy] formula may not be the sole determinant of whether a child has a SLD."

V.M. ex rel. B.M. v. Sparta Twp. Bd. of Educ., No. 12-892, 2014 WL 3020189, at *20 (D.N.J.

July 3, 2014); see M.M. v. Lafayette Sch. Dist., 767 F.3d 842, 853 (9th Cir. 2014) ("To the

extent the District argues it used solely the severe discrepancy model, the District would have

violated the IDEA."); M.B. ex rel. J.B. v. S. Orange/Maplewood Bd. of Educ., No. 09-5294,

2010 WL 3035494, at *8 (D.N.J. Aug. 3, 2010) ("[E]ven when using a severe discrepancy method for identifying specific learning disability, a school district may not look exclusively to numerical assessments of a child to make its determination.").  This principle — that a student cannot be ruled out solely on this basis — has been reaffirmed numerous times through Department of Education opinion letters.  See Letter to Delisle, 62 IDELR 240 (OSEP 2013) ("[I]t would be inconsistent with IDEA for a child, regardless of whether the child is gifted, to be found ineligible for special education and related services under the SLD category solely because the child scored above a particular [severe-discrepancy] cut score established by State policy."); Letter to Hugo, 62 IDELR 211 (OSEP 2013) (opining, in regard to Maine's disability-evaluation form that required a severe discrepancy, "[I]t would be inconsistent with § 300.304(b) for Maine to use such a form because it could result in children with SLD not being properly identified."); Letter to Prifitera, 48 IDELR 163 (OSEP 2007) ("Information from discrepancy, RTI and other alternative procedures is just one component of an overall comprehensive evaluation" because a school "'cannot rely on any single procedure as the sole criterion for determining eligibility for special education and related services.'") (quoting 71 Fed. Reg. at 46,648); Letter to Zirkel, 47 IDELR 269 (answering whether districts could essentially "cho[ose] among [several] models" by commenting that no single "process replace[s] the need for a comprehensive evaluation, and the results of a[] [given] process may be one component of the information reviewed").

Following these statutory and regulatory shifts, the District "eliminate[d] the 'severe discrepancy' requirement to determine whether a child has a Specific Learning Disability (SLD)."  52 D.C. Reg. 10,558 (Dec. 2, 2005).  In that provision's stead, D.C. regulations provide that the eligibility "team shall determine that a child has an SLD if . . . a disorder is manifested in one or more of the basic psychological processes involved in understanding or in using language,

25

spoken or written, which disorder may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations."  5-E D.C. Mun. Regs. § 3006.4(a); id. § 3006.4(b) (providing examples).  In assessing for a disability, District regulations also explicitly allow a response-to-intervention approach, id. § 3006.4(d), and exclude disorders that stem from a variety of sources not implicated here.  Id., §§ 3006.4(c), 3006.6.

Finally, there is the school-district layer.  Defendant alleges that, though the District no longer imposes a severe-discrepancy requirement and now permits the response-to-intervention model, D.C. regulations essentially leave open the possibility that DCPS would permit the discrepancy model.  See Def. Suppl. Mem. at 1-2; see also Letter to Zirkel, 47 IDELR 268. Attaching an "excerpt[] from the DCPS Psychology Guidebook (2016/2017)," Defendant attests that DCPS has indeed exercised that option by adopting two approaches: the discrepancy model and the intervention model.  See Def. Suppl. Mem., Exh. 1 (DCPS Psychology Guidebook).

b.  Whether N.D. Is Eligible

The question here is whether N.D. has a Specific Learning Disability.  The District asserts that KIPP and DCPS's form applied the discrepancy model from the DCPS Guidebook, see 2014 Eligibility Form at 187, and that, because N.D. did not exhibit a severe discrepancy, she was "appropriately exited from special education services."  Def. Suppl. Mem. at 3.  Defendant thus asks the Court to affirm the HOD, which approved this approach.  Davis retorts that districts "should grant eligibility to any student" who meets the D.C. psychological-processing definition, see 5-E D.C. Mun. Regs. § 3006.4(a), "irrespective of whether a severe discrepancy is present." Pl. Suppl. Mem. at 3.  In other words, the parties dispute whether a district can foreclose the Specific Learning Disability category solely because a student lacks a sufficient discrepancy.

Although Defendant's position initially seems to stand in tension with federal law, complete review of this matter requires, for several reasons, "further findings of fact and conclusions of law," and so the Court remands.  Lague v. District of Columbia, 130 F. Supp. 3d 305, 313-14 (D.D.C. 2015).

First, if the District is correct that DCPS has adopted both the discrepancy and intervention models as tools for locating a Specific Learning Disability, then the hearing officer did not completely account for the relevant criteria in the first place.  Instead, he stated that "DCPS'[s] definition for SLD . . . requires . . . that a student meet" the discrepancy model's three parts.  See HOD at 17 (emphasis added).

Second, the possible role of the Guidebook that DCPS purported to follow is unclear.  As far as the Court and Plaintiff can tell, it is not available to the public, let alone part of the record below.  See Pl. Suppl. Mem. at 1.  This absence would have made argument of issues and development of testimony relating to it impossible.  Perhaps more fundamentally, it is also not evident that the same criteria existed when KIPP and DCPS exited N.D. in 2014.  The record instead suggests that, since then, the rubric changed.  Where KIPP's 2014 form lists only the discrepancy model, its later 2015 worksheet provides: "[O]ption A — Discrepancy Model" and "Option B — Scientific Research-Based Intervention Model."  Compare 2015 Eligibility Form at 466 (omitting pages presumably where intervention checklist would be found), with 2014 Eligibility Form at 187.

The Court might hypothesize why KIPP and DCPS applied a single model in 2014, but these doors lead nowhere.  If it were that they believed that locating a discrepancy was the only way to find a Specific Learning Disability, their approach would have been in tension with a multitude of regulations that, by 2014, expressly permitted the response-to-intervention model.

See 34 C.F.R. §§ 300.307(b), 300.309(a); 5-E D.C. Mun. Regs. § 3006.4(d).  If Defendant,

alternatively, knew it could consider other factors but decided they were irrelevant, that choice

appears nowhere in the record.  Quite the opposite: A DCPS psychologist told Davis once that,

under the "IDEA definition," "[t]here would need to be 2 standard deviations between skills."

2015 Meeting Notes at 448; see 2014 Meeting Notes at 258 (explaining N.D. was always "within

1.5 standard deviations").  And KIPP explicitly describes the discrepancy model as "the required

criteria for specific learning disabilities."  2014 Eligibility Form at 188 (emphasis added).

Third, and relatedly, the Guidebook itself does not position the two models as an either/or

proposition — i.e., a setup where Defendant could simply reject one or the other.  In addressing

if a school could use only the response-to-intervention approach, the Guidebook's notes state:

> While the "response-to-intervention" model provides important
> information for the [team] to consider, the process of determining
> the presence of a severe discrepancy will continue to utilize an
> analysis of a child's cognitive and achievement profiles and remains
> an integral part of eligibility consideration for DCPS.

See DCPS Guidebook at 3.  In other words, the intervention model alone would not necessarily

be enough to find a disability.  It then posits the same for the discrepancy approach:

> A student does not automatically meet SLD criteria because a
> significant discrepancy exists.  The [team] must also assess and
> document the presence of a severe delay in classroom achievement
> and response to intervention, as well as consider deficits in
> information processing.

Id.  That is, meeting the discrepancy model alone might also not be enough.

In sum, these uncertainties necessitate a remand.  It is unclear whether the hearing officer

applied the correct standard, whether the DCPS Guidebook in operation at the time contained

those criteria, and whether the Guidebook even condoned what happened here.  If the Court

takes the record at face value, it would seem that the District implemented only the discrepancy

model and then exited N.D. solely because no disparity existed, an approach that is difficult to

square with regulations, guidance, and case law on the topic.  Even if the Court were to hold that a more "holistic inquiry" was warranted, Doe, 832 F.3d at 80, it would need to overhaul the HOD's factual findings, which only analyzed N.D.'s discrepancy.  See HOD at 17-19.  The Court, however, is "[m]indful of the admonition that reviewing courts not substitute their assessment of the evidence for that of hearing officers" and that remanding is thus appropriate.  Hammond v. District of Columbia, No. 99-1723, 2001 WL 34360429, at *8 (D.D.C. Mar. 1, 2001).

Finally, the Court notes that the hearing officer stated that Davis would still have to show that N.D. needed services "by reason of" her Specific Learning Disability.  See HOD at 19.  But, where the hearing officer misidentified the disability criteria and "addressed the need issue only briefly," the common approach is to remand.  Doe, 832 F.3d at 84 n.12; see Michael P., 656 F.3d at 1069 (remanding solely on improper disability criteria); N.G. v. District of Columbia, 556 F. Supp. 2d 11, 35 n.11 (D.D.C. 2008) (noting "inclin[ation] to remand" but for student's leaving DCPS); see also Dracut Sch. Comm. v. Bureau of Special Educ. Appeals, 737 F. Supp. 2d 35, 54-55 (D. Mass. 2010) (remanding "scope of the services required" when hearing officer erred by extending disability period).  Analyzing N.D.'s special-education needs would be impractical without knowing the precise nature of her disability.  See Amanda J. ex rel. Annette J. v. Clark Cty. Sch. Dist., 267 F.3d 877, 894 n.12 (9th Cir. 2001) ("Of course, the special needs of an autistic child cannot be addressed without the knowledge that a child is autistic."); see also 20 U.S.C. § 1401(29) (defining "special education" as "specially designed instruction . . . to meet the unique needs of a child") (emphases added); 34 C.F.R. § 300.8(10)(i) (specifying ways in which disability may "manifest itself" in list of particular needs).

*  *  *

29

The hearing officer should examine these issues in the first instance by identifying DCPS's Specific Learning Disability standard in a manner consistent with federal and local law and then, if necessary, applying those criteria to reassess fully N.D.'s eligibility.

### 2.   *Speech-Language Impairment*

Plaintiff's assertion about a second disability downs far fewer pins.  She contends that N.D. also continued to have a speech-language impairment.  To refresh, N.D. had received 120 minutes per month of speech therapy in her Revised 2013 IEP.   A "[s]peech or language impairment means a communication disorder, such as stuttering, impaired articulation, a language impairment, or a voice impairment, that <u>adversely affects</u> a child's educational performance."  34 C.F.R. § 300.8(11) (emphasis added); <u>see</u> 5-E D.C. Mun. Regs. § 3001.1.  The hearing officer ruled that Davis had brought no evidence that an impairment, if one existed, "impacted [N.D.'s] educational performance such that she required special education and related services."  HOD at 21.

On this score, Plaintiff has not carried her burden.  DCPS's specialist testified that N.D. did not demonstrate a disorder that "negatively impact[ed] that student's ability to access or gain benefit from the general education curriculum" because her speech-language functioning was "not a source of academic difficulty."  2014 SLI Report at 180.  Although the independent expert later identified a language impairment and potentially an auditory-processing deficit, <u>see</u> 2014 SLI IEE at 276, he was unable to point out specific adverse effects.  When asked directly, he testified that he "did not have th[e] data" on her classroom attainment.  <u>See</u> Lucker Tr. at 775-77.

The data that <u>do</u> exist also do not demonstrate an academic effect.  Davis cites N.D.'s standardized-testing reading scores, where she made absolute gains between Fall 2013 and Winter 2014, but her rank fell by 4 percentiles as compared to national averages.  <u>See</u> Mot. at 7

(referring to NWEA Assessments at 272).  By Spring 2014, however, she had again made strides and improved by a percentile.  See NWEA Assessments at 272.  Although the initial regress may suggest the need for therapy, the minor fluctuations that Davis seizes on are hardly of statistical moment.  See id. (providing roughly 20-percentile range student would be in "most of the time" "[i]f retested").  Finally, even though the independent specialist indicates what "would be" the academic effects of a language impairment, he nowhere discusses whether those impacts manifested in N.D.'s classroom experience.  See Lucker Tr. at 759-61.  On the contrary, the DCPS expert opined that her speech and language difficulties could be accommodated through in-class strategies.  See 2014 SLI Report at 180.  All said, Davis simply has not put forth the evidence to show that the hearing officer got the speech-language-impairment call wrong.

C.  Post-Ineligibility Evaluation

Last of all, Plaintiff contends that the District deprived N.D. of a free appropriate public education at the end of the fifth grade when it failed to evaluate her thoroughly after her exit from special education.  Specifically, Davis claims that Defendant should have tested her daughter for two other areas of disability: an auditory-processing disorder and a problem with visual-motor integration.  In other words, these tests could have revealed disorders independent of those previously diagnosed.  See E.M., 652 F.3d at 1006-07 (categorizing auditory processing as potential "other health impairment" under § 1401(3)(A)(i)); see also 34 C.F.R. §§ 300.34(c)(6)(ii), 300.304(c)(4) (listing "motor abilities" as "suspected disability" area).

This claim revolves around the independent educational evaluations completed after Davis objected to the 2014 reevaluation.  Although these IEEs had been gathered to reexamine N.D.'s Specific Learning Disability and speech-language impairment in spring 2015 (a year after she was exited, see supra Section III.B), they also flagged two other issues.  The psychological

IEE recommended that, because N.D.'s "score on [a visual-motor-integration test] was poorly developed" — which might result in "difficulties with eye-hand coordination" — those "deficits should be further evaluated by an occupational therapist, who should then determine if she will require school-based occupational therapy services."  2014 Psych. IEE at 336.  The speech-language IEE likewise suggested that, because possible "auditory processing deficits (APD) . . . could contribute to or account for . . . significant language problems," N.D. "should undergo a comprehensive auditory processing assessment."  2014 SLI IEE at 276.

Attaching these recommendations, in January and February 2015, Plaintiff asked for occupational-therapy and auditory-processing evaluations.  See A.R. at 317, 323, 430.  KIPP and DCPS did not proceed on those requests but instead reviewed the IEEs.  In its report on the speech-language IEE, a DCPS specialist gathered information from N.D.'s teachers and then summarized the IEE's findings.  See Review of SLI IEE at 368-73.  The DCPS review of the psychology IEE did the same, adding recent standardized-testing scores and classroom grades.  See Review of Psych. IEE at 384-91.  Neither report, however, further examined visual-motor or auditory-processing issues.  Following these reviews, KIPP and DCPS convened a meeting; because classroom performance was not a concern, they agreed that testing was unnecessary and she likely did not need services.  See 2015 Meeting Notes at 443-47 (considering "eligibility" for occupational therapy and whether she "qualif[ies]" for auditory-processing services).

The hearing officer then agreed that Davis had not proved that the school "needed an [occupational-therapy] reevaluation or an auditory processing assessment to determine whether [N.D.] is a student with a disability."  HOD at 25 n.4.  Although the officer's standard is somewhat vague, Plaintiff had easily cleared the bar for obtaining additional exams, which KIPP

and DCPS should have conducted before dismissing Davis's concerns.  The Court discusses the

law before turning to N.D.'s case.

            1.  *Comprehensive Evaluations*

      N.D. had for many years been <u>reevaluated</u> through the special-education system, but this

particular claim implicates IDEA's "initial evaluation criteria" because it involves two

"previously undiagnosed . . . disabilit[ies]."  <u>Seth B. ex rel. Donald B. v. Orleans Parish Sch. Bd.</u>,

810 F.3d 961, 976 (5th Cir. 2016); <u>see</u> HOD at 23 n.3.  The relevant evaluation provisions are, in

any event, substantially the same for both.  <u>See</u> 20 U.S.C. § 1414(a)(1), (2) (adopting, for both,

procedures in subsection (b)); <u>id.</u> § 1414(c) (adding requirements both "[a]s part of an initial

evaluation (if appropriate) and as part of any reevaluation").  Under these procedures, "[f]ailure

to locate and evaluate a potentially disabled child constitutes a denial of [a free appropriate

public education]."  <u>Long v. District of Columbia</u>, 780 F. Supp. 2d 49, 56 (D.D.C. 2011)

(quoting <u>N.G.</u>, 556 F. Supp. 2d at 16).

      A school district must "evaluate a student who <u>may have</u> a disability and who <u>may</u>

<u>require</u> special education services."  D.C. Code § 38-2561.02(a)(2) (emphases added).  This duty

applies to any "child <u>suspected of having</u> a disability who <u>may need</u> special education."  5-E

D.C. Mun. Regs. § 3004.1(a) (emphases added); <u>see</u> 34 C.F.R. § 300.111(c)(1) (extending duty

to "[c]hildren who are suspected of being a child with a disability . . . and in need of special

education, even though they are advancing from grade to grade").  Courts in this Circuit have

thus repeatedly held that school districts are required to complete an evaluation process "as soon

as a student is identified as a <u>potential</u> candidate for special education services."  <u>N.G.</u>, 556 F.

Supp. 2d at 25; <u>see</u> <u>Horne v. Potomac Preparatory P.C.S</u>, No. 15-115, 2016 WL 3962788, at *9

(D.D.C. July 20, 2016); <u>Hawkins</u>, 539 F. Supp. 2d at 114.

This "affirmative obligation" does not necessarily hinge on parents' flagging issues — though parental concerns are still relevant.  D.L. v. District of Columbia, 109 F. Supp. 3d 12, 35 (D.D.C. 2015); see Reid, 401 F.3d at 518 ("School districts may not ignore disabled students' needs, nor may they await parental demands before providing special instruction."); Horne, 2016 WL 3962788, at *9 (describing "affirmative duty"); see also Kruvant v. District of Columbia, No. 03-1402, 2005 WL 3276300, at *7 (D.D.C. Aug. 10, 2005) ("A child may be suspected of having a disability based on written parental concern.").  The process instead begins once the district is "on notice of substantial evidence that [the student] may have qualified for special education . . . such that she should have been evaluated."  N.G., 556 F. Supp. 2d at 26.

Once on notice, so begins the "evaluation" — "a process during which assessments occur."  T.P. ex rel. T.P v. Bryan Cty. Sch. Dist., 792 F.3d 1284, 1291 n.13 (11th Cir. 2016) (emphasis added).  The process consists of "a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child, including information provided by the parent, that may assist in determining . . . [w]hether the child is a child with a disability."  34 C.F.R. § 300.304(b)(1)(i); see 20 U.S.C. § 1414(b)(2); 5-E D.C. Mun. Regs. § 3005.4(a).  Those tools and strategies must be "tailored to assess specific areas of educational need," target "all areas related to the suspected disability," be "sufficiently comprehensive to identify all of the child's special education and related services needs," and "provide relevant information that directly assists persons in determining the educational needs of the child."  34 C.F.R. § 300.304(c); see 20 U.S.C. § 1414(b)(3).  That is, an evaluation both confirms the student's potential disabilities and examines whether she needs services.

The eligibility team then reviews assessments and other data, including information provided by the parents, state and local testing, and observations of the student.  See 34 C.F.R.

§ 300.305(a)(1).  "On the basis of that review, and input from the child's parents," the team must

then "identify what additional data, if any, are needed to determine" the disability and the child's

special needs.  Id. § 300.305(a)(2); see 5-E D.C. Mun. Regs. § 3005.4(b).  "Qualified evaluators,

under the direction of the [eligibility] team, shall administer tests and other assessment

procedures as may be needed to produce the data required to make the[se] determinations."  5-E

D.C. Mun. Regs. § 3005.5.  Only then does a school district determine a child's eligibility.

### 2. *N.D.'s Evaluations*

Plaintiff primarily presses for the two further examinations recommended by the IEEs.

On this claim, the hearing officer agreed with the March 2015 eligibility-team decision that no

evaluation was warranted to determine whether N.D. needed services for visual-motor-

integration issues or for auditory-processing deficits.  See HOD at 23-25.

This hobbled horse cannot run.  It appears that, despite being on notice, KIPP and DCPS

conducted no evaluations at all; even if they afforded N.D. some process, they in no way

comprehensively evaluated her in a manner consistent with IDEA.

Defendant first found that, because there were "no concerns in the classroom" of visual-

motor integration and no "key indicators" of an auditory-processing issue, no new evaluations

were "warranted."  2015 Meeting Notes at 445-46.  In other words, it seems the District provided

no evaluation at all.  Id. (commenting, "I see no need to perform an evaluation" for occupational

therapy and that N.D. might not "warrant[] a[n] [auditory-processing] evaluation").  The hearing

officer echoed that Davis had "offered no evidence that [N.D.] exhibited visual-motor issues

which had an impact on her classroom performance" or had "key indicators for an auditory

processing disorder."  HOD at 24-25.  This line of thinking, however, launches the cart in front

of our proverbial horse.  The question is not whether a parent, before tests are even done, can

show that her child has a disability, let alone one affecting academics, but rather whether the school has <u>suspicions</u> such that a comprehensive evaluation is needed.  See <u>N.G.</u>, 556 F. Supp. 2d at 25-26 (rejecting similar argument that there "was insufficient evidence that her 'emotional issues' were adversely impacting her education").

Plaintiff has satisfied that minimal threshold.  Her two third-party medical examinations <u>specified</u> potential disabilities that could affect her academic abilities and made <u>precise</u> formal recommendations as to visual-motor and auditory-processing testing, and Davis offered additional written parental requests.  The IEEs, specifically, flagged that there might be "difficulties with eye-hand coordination" and "significant language problems."  2014 Psych. IEE at 336; 2014 SLI IEE at 276.  This sort of specific notice is more than what most courts require for creating a suspicion of a disability and academic impact.  <u>See, e.g.</u>, <u>N.G.</u>, 556 F. Supp. 2d at 23, 25-30 (finding psychologist's "diagnostic impressions" of "history of depression with past suicide attempts and hospitalization" warranted exams for emotional disturbance).  Although DCPS's experts might have thought otherwise, "'informed suspicions of parents, who may have consulted outside experts,' trigger the requirement to assess, even if the school district disagrees with the parent's suspicions."  <u>Timothy O. v. Paso Robles Unified Sch. Dist.</u>, 822 F.3d 1105, 1120 (9th Cir. 2016) (quoting <u>Pasatiempo ex rel. Pasatiempo v. Aizawa</u>, 103 F.3d 796, 802 (9th Cir. 1996)); <u>Kruvant</u>, 2005 WL 3276300, at *10 ("[T]he regulations make clear that the [parental] referral to the neighborhood school is the triggering event for the initial evaluation.").  In addition, as only a reader with eidetic memory would recall, by March 2015, N.D.'s grades had plummeted to C's and a D, enough to heighten the alarms.  <u>See</u> 2015 Meetings Notes at 443.

Even if KIPP and DCPS performed <u>some</u> evaluation of these two new areas by simply recapping the IEEs' suspicions, what they did was too cursory.  Seeking <u>no</u> assessments as to

visual-motor integration and auditory processing is hardly consistent with the district's duty to conduct testing that targets "all areas related to the suspected disability" and is "sufficiently comprehensive to identify all of the child's special education and related services needs."  34 C.F.R. § 300.304(c).  This is particularly so where independent reports themselves specify what outside information needs to be gathered.  See Seth B., 810 F.3d at 978 ("The right to an IEE . . . enables parents to genuinely and consequentially take part in the IDEA process and . . . allows them to introduce additional and different data into that process, informing its ultimate outcomes.").

 In other words, although DCPS's reviews of these IEEs summarized their points about possible visual-motor and auditory-processing issues, neither review actually discussed how N.D. did not exhibit those disabilities, whether those disabilities might affect classroom performance, or why testing would not be fruitful.  See 2015 Review of Psych. IEE at 385 (noting, in single sentence, N.D.'s visual-motor-integration scores); 2015 Review of SLI IEE at 372-73 (defining, but not analyzing, auditory-processing deficit).  This is not surprising given the testing history.  The reviews were (rightfully) focused on the previously discussed Specific Learning Disability and speech-language impairment that had been at issue and thus did not express an opinion on the presence of other potential disabilities or their educational impacts.

The flaw in the District's approach manifested itself through uninformed eligibility discussions.  Without any of the recommended assessments — and perhaps without any evaluation process at all — KIPP and the DCPS team were left to hypothesize whether N.D. was actually disabled.  See 2015 Meeting Notes at 444, 446.  This tree bore no fruit.  At the meeting, a DCPS specialist even admitted that extant "testing was not robust enough to warrant a diagnosis" based on an auditory-processing deficit and another noted how they relied on a

"previous <u>2011</u> [occupational-therapy] evaluation." <u>Id.</u> at 445-46 (emphases added).  At this point, the District was obligated to seek out any necessary "additional data" before deciding eligibility.  <u>Id.</u> § 300.305(a)(2); 5-E D.C. Mun. Regs. § 3005.4(b).  It appears — though the record lacks supporting paperwork — that the team nonetheless found that N.D. did not have either disability.  <u>See</u> 2015 Meeting Notes at 446-47.  It is somewhat puzzling, however, how they could have even considered eligibility without having information as to the potential disorder or its possible effects.

All told, KIPP and DCPS should have taken the independent testing recommendations far more seriously than they did.  Because they did not, the Court concludes that Defendant violated its obligation to ensure N.D. a free appropriate public education.

IV.    **Conclusion**

For these reasons, the Court will grant in part and deny in part Plaintiff's Motion for Summary Judgment and grant in part and deny in part Defendant's Cross-Motion for Summary Judgment.  The HOD will be affirmed in part, vacated as to its holding that N.D. did not have a Specific Learning Disability, and reversed as to its conclusion that she did not merit further evaluations.  The Court will remand for the hearing officer to reexamine her Specific Learning Disability eligibility consistent with this Opinion and decide any appropriate relief.  It will also order Defendant to conduct an occupational-therapy and a comprehensive auditory-processing evaluation or to fund them, either in conjunction with the next scheduled assessment process or separately, if it has not done so already.  A separate Order so stating will issue this day.

/s/ <u>*James E. Boasberg*</u>
JAMES E. BOASBERG
United States District Judge

Date:  <u>March 23, 2017</u>